UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 1:20-mj-02337-JG

UNITED STATES OF AMERICA

v.

ROBERTO HEINERT,

    Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)? ___Yes _x_ No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? ___Yes _x_ No

    Respectfully submitted,

    ROBERT ZINK, CHIEF
    CRIMINAL DIVISION, FRAUD SECTION
    U.S. DEPARTMENT OF JUSTICE

By: _____
    ALEXANDER KRAMER
    TRIAL ATTORNEY
    Criminal Division, Fraud Section
    U.S. Department of Justice
    Court ID No. A5502240
    99 NE 4th Street
    Miami, Florida 33132-2111
    Tel: (202) 768-1919

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) |
| v. | ) |
| ROBERTO HEINERT | ) Case No. 1:20-mj-02337-Jh |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __2014 - 2016__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to launder bribery proceeds in U.S. currency through bank accounts in order to conceal the nature, location, source, ownership, and control of the proceeds |

This criminal complaint is based on these facts:

[see attached affidavit]

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Jeff LaMirand, IRS-CI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 3 2020

_____
*Judge's signature*

City and state: Miami, FL

Magistrate Judge Jonathan Goodman
*Printed name and title*

I, JEFFREY LAMIRAND, being duly sworn, depose and state as follows:

1. I am a Special Agent with the Internal Revenue Service, Criminal Investigation ("IRS-CI"). I have been an IRS-CI Special Agent since on or about July 9, 2010. My responsibilities include the investigation of possible criminal violations of the Internal Revenue Laws (Title 26, United States Code), the Bank Secrecy Act (Title 31, United States Code), the Money Laundering Control Act (Title 18, United States Code), and other related offenses. I hold a bachelor's degree in accounting and finance from Michigan State University. I also hold a Juris Doctor degree from Chicago-Kent College of Law. I am a certified public accountant (CPA) licensed to practice in the State of Virginia and an attorney licensed to practice in the State of Illinois. On or about February 8, 2014, I became a full-time member of the Global Illicit Financial Team ("GIFT"), a multi-agency task force within IRS-CI whose mission is to investigate large, international third-party money laundering cases. I am fluent in Spanish. As part of my work at the IRS, I have received training regarding fraud and white collar crimes, including the Foreign Corrupt Practices Act ("FCPA") and money laundering.

2. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, witness interview notes, my participation in witness interviews, and conversations with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

3. Your affiant has participated in a criminal investigation into **ROBERTO HEINERT**, a United States citizen who currently resides in Miami-Dade County, Florida. Based on the evidence gathered through this investigation, there is probable cause to believe that from in or around 2014 through at least in or around 2016, in the Southern District of Florida and elsewhere, **ROBERTO HEINERT**, together with others, engaged in a bribery scheme that violated United States law and Ecuadorian bribery law, and from in or around 2014 through in or around 2016, **ROBERTO HEINERT**, together with others, conspired to launder monetary instruments, in violation of Title 18, United States Code, Section 1956(h), that is: knowing that the property involved in a financial

transaction represented the proceeds of the unlawful bribery scheme, conducted and attempted to conduct such a financial transaction which in fact represented the proceeds of specified unlawful activity, knowing that the transaction was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

4. Bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2 and bribery of a public official of Ecuador, a felony violation of the penal code of the Republic of Ecuador, are specified unlawful activities, pursuant to Title 18, United States Code, Sections 1956(c)(7)(B)(iv) and (D).

### THE U.S. FOREIGN CORRUPT PRACTICES ACT (FCPA)

5. Your affiant is aware that the FCPA was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for or with, or directing business to any, person. 15 U.S.C. §§ 78dd-1, *et seq.*

6. The FCPA prohibits "domestic concerns," which include residents of the United States, from making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value, to a foreign official or to a person, while knowing that all or part of such money or thing of value would be and had been offered, given, or promised to a foreign official, for purposes of (i) influencing acts or decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do or omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; or (iv) inducing such foreign official to use his influence with a foreign government or agencies or instrumentalities thereof to affect or influence acts or decisions of such government or agencies or instrumentalities, in order assist the domestic concern to obtain or retain business for or with, or directing business to, any person. 15 U.S.C. § 78dd-2(a) and (h)(1)(A).

### THE ECUADORIAN PENAL CODE RELATING TO BRIBERY OF A PUBLIC OFFICIAL

7. From my review of an English translation of the Penal Code of the Republic of Ecuador (the "Ecuadorian Penal Code") in effect from at least in or around February 2014 through the present contains the following relevant provision relating to bribery of a public official, as translated from Spanish:

    a. Article 280 [Bribery]: Any public servant and any person that acts on behalf of a state power within any of the State's institutions, listed in the Constitution of the Republic, that receives or accepts, directly or through a third party, an improper economic benefit, or any other type of benefit for himself or for a third party, either to carry out, omit, expedite, delay or condition matters related to his or her functions, shall be punished with a term of imprisonment of one to three years. If the public servant executes an act or fails to carry out the proper act, he or she shall be punished with a term of imprisonment of three to five years. If the conduct described is carried out in order to commit another crime, the public servant shall be punished with a term of imprisonment of five to seven years. Any person who in any way offers, gives or promises any public servant a donation, gift, promise, advantage, or improper economic benefit in order for such servant to carry out, omit, expedite, delay, or condition matters related to his or her functions, or in order to commit a crime, shall be punished with the same penalties issued against public servants.

## RELEVANT ENTITIES AND INDIVIDUALS

8. Seguros Sucre S.A. ("Seguros Sucre") was the state-owned insurance company of Ecuador. Seguros Sucre was controlled by the government of Ecuador and performed a function that Ecuador treated as its own, and thus was an "instrumentality" of the Ecuadorian government as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

9. "Seguros Sucre Official," an individual whose identity is known to your affiant, was a citizen of Ecuador who served as a director of Seguros Sucre and an advisor to the President of Ecuador from at least in or about 2013 through at least in or about 2017. Seguros Sucre Official was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A). Seguros Sucre Official maintains residence in Miami-Dade County, Florida.

10. "Introducer Company," a company whose identity is known to your affiant, was a Panama registered company that operated as a reinsurance introducer. In that capacity, Introducer

helped companies obtain and retain contracts with Seguros Sucre in exchange for receiving a commission.

11.  **ROBERTO HEINERT**, the defendant, was a dual United States and Ecuadorian citizen and one of the owners of Introducer Company. **ROBERTO HEINERT** maintained residence in Miami-Dade County, Florida. **ROBERTO HEINERT** was a "domestic concern" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A).

12.  "Introducer Executive," an individual whose identity is known to your affiant, was an Ecuadorian citizen, a U.S. lawful permanent resident, and one of the owners of Introducer Company. Introducer Executive maintained residence in Miami-Dade County, Florida. Introducer Executive was a "domestic concern" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A).

13.  "Insurance Broker," a company whose identity is known to your affiant, was a reinsurance broker and risk adviser based in the United Kingdom. Insurance Broker wholly- or majority-owned subsidiaries based in Colombia through which it acted as a broker for insurance companies in Colombia and Latin America, assisting them to reinsure their risks in the local and international (re)insurance markets. Seguros Sucre was a client of Insurance Broker. Insurance Broker conducted its business with Seguros Sucre through its Colombian based subsidiaries and other wholly- or majority-owned entities.

14.  "Insurance Executive," an individual whose identity is known to your affiant, was an executive and shareholder of Insurance Broker's Colombian-based subsidiaries from in or around at least 2013 through in or around 2019.

15.  "Intermediary Company 1," a company whose identity is known to your affiant, was a company formed and registered in Panama. Intermediary Company 1 held a brokerage account with a bank in Switzerland (the "Intermediary Company 1 brokerage account"). Introducer Executive controlled Intermediary Company 1 and could direct payments into and out of the Intermediary Company 1 brokerage account.

16.  "Intermediary Company 2" a company whose identity is known to your affiant, was a company formed and registered in the Cayman Islands. Intermediary Company 2 held multiple accounts with a bank in the United States, at least three of which were used to facilitate transfers of cash and securities between

accounts identified herein (the "Intermediary Company 2 accounts").

17. "Intermediary Company 3," a company whose identity is known to your affiant, was a company formed and registered in Panama. Intermediary Company 3 held a brokerage account with a bank in Switzerland (the "Intermediary Company 3 brokerage account"), which was held for the benefit of Seguros Sucre Official and received and held a portion of the bribe payments from **ROBERTO HEINERT**, Introducer Executive, and Insurance Executive to Seguros Sucre Official. The Intermediary Company 3 brokerage account was largely funded by Intermediary Company 1.

18. "Financial Advisor," an individual whose identity is known to your affiant, was a dual United States and Ecuadorian citizen, a relative of Introducer Executive, and a financial advisor at a financial services firm who had authority to cause transfers into and from the Intermediary Company 1 brokerage account, Intermediary Company 2 accounts, and Intermediary Company 3 brokerage account. Financial Advisor was a "domestic concern" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A), and a "United States person" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(i).

**OVERVIEW OF THE SCHEME TO LAUNDER BRIBERY PROCEEDS**

19. As described in greater detail below, Seguros Sucre Official, while acting as a director of Seguros Sucre, received bribes from **ROBERTO HEINERT**, Introducer Executive, and Insurance Executive, in exchange for using his position to assist **ROBERTO HEINERT** and others to obtain and retain business for Insurance Broker with Seguros Sucre, in violation of the FCPA and Ecuador's law against bribery of a public official.

20. In order to conceal and disguise the bribe payments, **ROBERTO HEINERT**, Seguros Sucre Official, Introducer Executive, and Insurance Executive, together with others, caused bribery proceeds of at least approximately $1,004,000 to be laundered through bank accounts in the United States for the benefit of Seguros Sucre Official and others, in violation of U.S. money laundering laws.

**THE BRIBERY AND MONEY LAUNDERING SCHEME**

21. From my review of emails, contracts, documents, bank records, witness interviews and from my participation in this investigation, I have learned, among other things, the following:

22. From at least in or around 2013 through at least in or around 2017, **SEGUROS SUCRE OFFICIAL**, as a director of Seguros Sucre, had influence relating to the award of Seguros Sucre contracts.

23. In or around June 2013, Insurance Broker obtained reinsurance business from Seguros Sucre to be the reinsurance broker for the Ecuadorian Ministry of Defense ("MOD") for the period 2013 through 2014.

24. In or around late 2013, Seguros Sucre informed Insurance Broker that Seguros Sucre might not renew Insurance Broker's MOD reinsurance policy.

25. In or around early 2014, Insurance Executive approached the owners of Introducer Company, **ROBERTO HEINERT** and Introducer Executive, about helping Insurance Broker retain the contract to provide reinsurance for MOD. **ROBERTO HEINERT** and Insurance Executive arranged meetings with Seguros Sucre executives, including Seguros Sucre Official. Following these meetings, Seguros Sucre agreed to retain Insurance Broker's MOD policy.

26. In or around May 2014, after Seguros Sucre agreed to maintain Insurance Broker's MOD policy, Insurance Broker approved Introducer Company as an introducer. Insurance Broker approved the payment of any future commissions to Introducer Company's Panama bank account given that Introducer Company was a Panama-based company.

27. In or around September 2014, Insurance Broker and Introducer Company reached an agreement whereby Insurance Broker agreed to pay Introducer Company $1.8 million commission for the MOD 2013 through 2014 contract and an 8% commission on the MOD 2014 through 2015 contract.

28. The commission payments to Introducer Company, however, were not made to its approved Panama bank account. Rather, at Introducer Executive and **ROBERTO HEINERT's** request and with **ROBERTO HEINERT** and Introducer Executive's approval, payments totaling approximately $10.8 million in commissions to Introducer Company were made to accounts in the United States, Panama, and Switzerland that were not held in the Introducer Company's name but rather in the name of Intermediary Company 1 and other entities (the "Unapproved Accounts").

29. Specifically, from on or about October 2, 2014 to on or about October 28, 2016, a U.S. bank account held by Insurance

Broker's Colombian subsidiary made at least eleven wire transfers totaling at least approximately $6,510,735 to Intermediary Company 1's brokerage account in Switzerland. These payments were Introducer Company's commissions from the reinsurance policies with Seguros Sucre to insure MOD and other state-owned entities of Ecuador.

30. In or around February 2015, Introducer Executive and Insurance Executive caused to be created a false, backdated contract between Insurance Broker's Colombian-based subsidiary and Intermediary Company 1, signed by Insurance Executive, which was sent to Intermediary Company 1's Swiss bank to justify the payments sent by Insurance Broker to Intermediary Company 1.

31. A portion of the commission payments from Insurance Broker to Introducer Company for the Seguros Sucre contracts were funneled to Seguros Sucre Official and others close to him through transactions involving multiple intermediary companies and securities transfers. Specifically, Intermediary Company 1 brokerage account, which was funded almost exclusively with Insurance Broker commission payments to Introducer Company, transferred at least approximately $682,000 in cash and $1,975,000 worth of securities ($2,657,000 total value) to Intermediary Company 3 brokerage account, which was held for the benefit of Seguros Sucre Official. All but one of these transfers occurred though U.S.- based accounts held by Intermediary Company 2. Furthermore, Intermediary Company 1 and Intermediary Company 3 Swiss-based brokerage accounts funneled through Intermediary Company 2 U.S.-based accounts at least approximately $750,000 into U.S.-based accounts held by Seguros Sucre Official and at least approximately $254,000 into U.S.-based accounts held by Seguros Sucre Official's relatives.

32. On or about March 23, 2016, Financial Advisor exchanged emails with his assistant regarding Intermediary Company 1 payments made to Seguros Sucre Official between in or around November 2014 and January 2016 and those still pending. The correspondence references Seguros Sucre Official by initials and by name and also references Seguros Sucre Official as linked to Intermediary Company 3.

33. Between in or around 2014 and in or around 2016, **ROBERTO HEINERT** participated in meetings with his coconspirators in the Southern District of Florida and elsewhere to discuss the money laundering scheme, including the amount of Introducer Company's commissions from Insurance Broker to be distributed as bribe payments to Seguros Sucre Official.

34. Between in or around 2014 and in or around 2017, **ROBERTO HEINERT** received at least approximately $2.2 million in Insurance Broker commission payments.

35. On or about August 28, 2014, **ROBERTO HEINERT** emailed Financial Advisor records of two wire transfers of approximately $50,794 each from one of the Unapproved Accounts on or about August 21, 2014, one to a bank account controlled by **ROBERTO HEINERT** and another to an Intermediary Company 1 bank account.

36. On or about September 22, 2014, **ROBERTO HEINERT** emailed Insurance Executive, copying Introducer Executive, bank account information for an Intermediary Company 1 bank account for a transfer.

37. On or about October 17, 2014, **ROBERTO HEINERT** emailed Insurance Executive, copying Introducer Executive, bank account information for the Intermediary Company 1 brokerage account.

### A. November 2014 Transfer of $400,000 for Benefit of Seguros Sucre Official

38. On or about November 3, 2014, Introducer Executive caused the Intermediary Company 1 brokerage account to transfer approximately $400,000 to the Intermediary Company 3 brokerage account, which was an account used to receive and hold funds for the benefit of Seguros Sucre Official.

### B. December 2014 Payment of $300,000 to Seguros Sucre Official

39. On or about December 8, 2014, Intermediary Company 1's brokerage account transferred approximately $319,777 of Introducer Company's commissions on the MOD contracts to one of the Intermediary Company 2 accounts through the purchase of a security.

40. On or about December 18, 2014, the same Intermediary Company 2 account wired $300,000 of the $319,777 to a U.S. based bank account in the name of Seguros Sucre Official.

### C. January 2015 Payment of $282,000 to Intermediary Company 3

41. On or about December 9, 2014, while in the Southern District of Florida, Introducer Executive sent an email to

Financial Advisor, directing him to transfer $282,000 to "el amigo."

42. On or about December 12, 2014, Financial Advisor caused the Intermediary Company 1 brokerage account to transfer approximately $310,158 to one of the Intermediary Company 2 accounts through the purported purchase of a security.

43. On or about January 15, 2015, Financial Advisor caused the Intermediary Company 2 account to wire approximately $282,000 of the $310,158 to the Intermediary Company 3 brokerage account.

### D. June 2015 Payment of $100,000 to Seguros Sucre Official

44. On or about June 8, 2015, Financial Advisor caused the Intermediary Company 3 brokerage account to transfer approximately $106,706 back to one of the Intermediary Company 2 accounts through the purchase of a security.

45. On or about June 8, 2015, Financial Advisor caused the same Intermediary Company 2 account to wire $100,000 of the $106,706 to a U.S.-based bank account in the name of Seguros Sucre Official.

### E. March and April 2016 Payment of $104,000 to Seguros Sucre Official's Relatives

46. From on or about March 31, 2016 to on or about April 11, 2016, Financial Advisor caused one of the Intermediary Company 2 accounts to make three wire transfers to the U.S. based accounts in the names of relatives of Seguros Sucre Official that totaled approximately $104,000.

47. First, on or about March 31, 2016, Financial Advisor caused the Intermediary Company 2 account to wire approximately $29,000 to a U.S.-based bank account in the name of a relative of Seguros Sucre Official.

48. Second, on or about April 11, 2016, Financial Advisor caused the Intermediary Company 2 account to wire approximately $65,000 to a U.S.-based bank account in the name of a second relative of Seguros Sucre Official.

49. Third, on or about April 11, 2016, Financial Advisor caused the Intermediary Company 2 account to wire approximately $10,000 to a U.S.-based bank account in the name of a third relative of Seguros Sucre Official.

50. On or about May 12, 2016, Financial Advisor caused the Intermediary Company 3 brokerage account to transfer $104,000 in securities to the Intermediary Company 2 account in order to reimburse Intermediary Company 2 for making approximately $104,000 in transfers to Seguros Sucre Official's relatives.

**E. May-August 2016 Emails Regarding "Loans" from Insurance Executive to Seguros Sucre Official and Another Official of Seguros Sucre**

51. Between in or around May 5, 2016 and June 6, 2016 Insurance Executive sent emails to **ROBERTO HEINERT** and Introducer Executive discussing repayment owed to Insurance Executive for $200,000 "loaned" to [first name of a second Seguros Sucre executive] with the agreement to be repaid from the MOD commission. Insurance Executive also referenced the "1%" for [first name of a second Seguros Sucre executive].

52. On or about August 8, 2016, Insurance Executive emailed **ROBERTO HEINERT** and Introducer Executive referencing $80,000 that he had transferred from his personal funds for "Termopinchincha," which your affiant believes to be a reference to CELEC EP Termopinchincha, a business unit of the Ecuadorian public electric company and one of the entities in connection with which Insurance Broker received reinsurance business with Seguros Sucre. Insurance Executive further stated (translated from Spanish), "We need to find a way for me to get back this 80,000 plus the 200,000 that I transferred last year in order to transfer an adjustment to [first name of Seguros Sucre Official]." Your affiant believes this to be a reference to Seguros Sucre Official.

53. Based on the foregoing, specifically the transfers made from Intermediary Company 1 to Intermediary Company 2 and Intermediary Company 3 knowing that a portion of such money would be offered, given, or promised, directly or indirectly, to Seguros Sucre Official, there is probable cause to believe that, from in or around 2014 through at least in or around 2016, **ROBERTO HEINERT** and Introducer Executive, each a "domestic concern" under the FCPA, willfully and corruptly made use of the mails and means and instrumentalities of interstate commerce in furtherance of an offer and promise to make payments for the benefit of Ecuadorian officials, including Seguros Sucre Official, for the purpose of corruptly influencing those officials in order to assist **ROBERTO HEINERT** in obtaining and retaining business for, and directing business to, himself, Introducer Company, Insurance Executive, and Insurance Broker, in violation of Title 15, United States Code, Section 78dd-2.

54.  Based on the foregoing, and based on my review of the Ecuadorian Penal Code, there is also probable cause to believe that the bribery scheme conducted by **ROBERTO HEINERT**, Seguros Sucre Official, Introducer Executive, and Insurance Executive, and others as described above, in which Seguros Sucre Official received bribes from **ROBERTO HEINERT**, Introducer Executive, and Insurance Executive in exchange for, among other things, obtaining and retaining contracts from Seguros Sucre, was an offense under, *inter alia*, Ecuadorian law prohibiting bribery of public officials.

55.  Based on the foregoing, specifically the subsequent movement of a portion of the payments received by Intermediary Company 2 and Intermediary Company 3, directly or through securities transactions, from Intermediary Company 1, to accounts held in the name of or for the benefit of Seguros Sucre Official or his relatives, there is also probable cause to believe that, in or around 2014, through at least in or around 2016, **ROBERTO HEINERT**, Seguros Sucre Official, Introducer Executive, and Insurance Executive conspired with others to commit money laundering.  Specifically, there is probable cause to believe that **ROBERTO HEINERT** conspired with Seguros Sucre Official, Introducer Executive, and Insurance Executive, and others, to launder bribery proceeds in U.S. currency through bank accounts, including bank accounts in the United States, in order to conceal the nature, location, source, ownership, and control of the proceeds, in violation of Title 18, United States Code, Section 1956(h).

## CONCLUSION

Based on the foregoing, I believe that probable cause exists to issue a criminal complaint and arrest warrant charging **ROBERTO HEINERT** with violating Title 18, United States Code, Section 1956(h).

Your affiant therefore respectfully requests that the Court enter a complaint for the foregoing violations and issue a warrant for the arrest of **ROBERTO HEINERT**.

_____
JEFFREY LAMIRAND
SPECIAL AGENT
INTERNAL REVENUE SERVICE

Sworn to before me this
10th day of March 2020

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA